**In re Nellie B. FIELDS d/b/a Advantage Storage, Debtor.**

**Bankruptcy No. 90–54059–C.**

United States Bankruptcy Court,
W.D. Texas,
San Antonio Division.

April 4, 1991.

---

Michael A. McConnell, Fort Worth, Tex., for NCNB Texas National Bank.

Martin W. Seidler, San Antonio, Tex., for debtor.

## MEMORANDUM DECISION

Leif M. CLARK, Bankruptcy Judge.

CAME ON for consideration the Motion of NCNB Texas National Bank for Relief From Stay Against Property of the Estate and the objection filed thereto by the Debtor Nellie B. Fields. This decision is entered with respect to that motion.

### JURISDICTION

This court has original subject matter jurisdiction of this matter pursuant to 28 U.S.C. § 1334(b). This matter is a core proceeding. 28 U.S.C. § 157(b)(2)(G).

### FACTUAL BACKGROUND

Nellie B. Fields d/b/a Advantage Storage ("Debtor") filed for relief under Chapter 11 of the Bankruptcy Code on December 21, 1990. The property in issue is the Advantage Storage Complex ("subject property") which consists of approximately 477 concrete block self-storage units and a custodian's living quarters. NCNB Texas National Bank ("NCNB") holds a first lien on the property. Debtor owes NCNB $2,067,059.66.

The parties have stipulated that the Debtor has no equity in the subject property and that the property is generating income sufficient to cover debt service to NCNB, based upon a stipulated value of $670,000.00. The parties also stipulated that the Debtor has other properties and assets that are generating income and that "there is a reasonable likelihood of a successful reorganization of the Debtor within a reasonable time." 11 U.S.C. § 362(d)(2)(B).

NCNB's main contention is that "the Debtor has numerous other assets to form the basis of a plan of reorganization," so the Debtor's plan can still work without the subject property and the income being generated from it. NCNB then maintains that, therefore, this property is not *necessary* for the Debtor's "effective reorganization."

Debtor counters that the property is indeed necessary for her to effectively reorganize her affairs and is essential to the overall success of her Chapter 11 plan. Debtor notes that the subject property is capable of generating income to eventually pay down claims of unsecured creditors in full, although that income would not be available for at least ten years.

### ANALYSIS

The sole issue for decision is whether this income-producing property is not necessary for the effective reorganization of this Debtor. "[T]he court shall grant relief from stay provided ... the debtor does not have any equity in such property; and (B) *such property is not necessary* to an effective reorganization." 11 U.S.C. § 362(d) (emphasis added).

The term "necessary" is not defined in the Bankruptcy Code although it appears in a number of sections. *See* 11 U.S.C. §§ 1322(a)(1), 327(b), 330(a)(1) and 503(b)(3). Case law elucidating the meaning of the term is rather sparse. The Supreme Court in *Timbers*, has commented that "[w]hat [necessary to an effective reorganization] requires is not merely a showing that if there is conceivably to be an effective reorganization, this property will be needed for it; but that the property is essential for an effective reorganization that is in prospect." *United Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 108 S.Ct. 626, 632, 98 L.Ed.2d 740 (1988). The obvious emphasis is on what makes for an effective reor-

ganization rather than what property might be *necessary* for that reorganization. One fairly recent Texas case warns that the mere fact that property might prove "helpful" is not enough to satisfy the necessity requirement. *In re Endrex Exploration Co.*, 101 B.R. 474, 476 (N.D.Tex. 1988). Unfortunately, trading "necessary" for "helpful" is not very helpful at all.

▌ Faced with this paucity of authority, we turn to first principles for guidance. One such principle is the rule of statutory construction that statutes should, to the extent possible, be construed to give effect to every word Congress used. *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339, 99 S.Ct. 2326, 2331, 60 L.Ed.2d 931 (1979). Where the literal reading of a statutory term would "compel and odd result," a court should search for other evidence of congressional intent to lend the term its proper scope. *Green v. Bock Laundry Machine Co.*, 490 U.S. 504, 109 S.Ct. 1981, 104 L.Ed.2d 557 (1989); *Public Citizen v. U.S. Dept. of Justice*, 491 U.S. 440, 454, 109 S.Ct. 2558, 2566, 105 L.Ed.2d 377, 392 (1989). "The circumstances of the enactment of particular legislation," for example, "may persuade a court that Congress did not intend words of common meaning to have their literal effect." *Watt v. Alaska*, 451 U.S. 259, 266, 101 S.Ct. 1673, 1678, 68 L.Ed.2d 80 (1981).

NCNB in this motion urges a literal reading of the term "not necessary" on the court. NCNB also urges a harsh reading of the term, one which would require a court to pose a flinty-eyed query to debtors every time a motion for relief from stay is filed: "Do you really *need* this property for this reorganization to work? Couldn't you do without it?" NCNB suggests that, if the answer to that question is "no," then the stay should immediately lift without further inquiry.

A simple hypothetical demonstrates how such a reading leads quickly to an absurd result. Consider for example an air line estate which owns airplanes, each financed with a different lender. No one plane is really *necessary*, under a literal reading of that term, but how many planes would have to be lost to stay litigation before the court finally had to draw the line and deny such motions on grounds that the remaining planes were necessary? Applying such a reading to "necessary" would reward impatient creditors, while punishing creditors who, by working with the estate, exercise self-restraint and do not immediately seek relief from the stay. This approach would only encourage a post-petition race to the courthouse, in direct conflict with clear bankruptcy policy which discourages such *pre*-petition races. *See GATX Aircraft Corp. v. M/V Courtney Leigh*, 768 F.2d 711, 716 (5th Cir.1985). It would also discourage consensual workouts. This reading, in short, leads to absurd results. We are thus justified in looking beyond the literal meaning of the term "not necessary," to the circumstances which lay behind the enactment of this provision of the Bankruptcy Code for guidance. *Watt v. Alaska, supra.*

The legislative history to 11 U.S.C. § 362(d) reveals that the Senate was quite concerned about bankruptcies filed on the eve of foreclosure in single asset real estate cases. The Senate version of this section contained express safeguards for lenders in such cases.[1] In the accompanying Senate Report, the committee explained that "[a]n exception to 'the necessary to an effective reorganization' requirement is made for real property on which no business is being conducted other than operating the real property and activities incident

---

1. The Senate version provided that:
   property is not necessary to an effective reorganization of the debtor if it is real property on which no business is being conducted by the debtor other than the business of operating the real property and activities incident thereto. Where the debtor owns two or more properties for which an established business enterprise has been created for the purpose of

managing and leasing such properties, however, the court may find that one or more of such properties are essential to the effective reorganization of such real estate management enterprise.

11 U.S.C. § 362(d) (proposed), S.2266, 95th Cong., 2nd Sess., as reported by the Senate Judiciary Committee and the Senate Finance Committee (1978).

thereto. The intent of this exception is to reach the single-asset apartment type cases which involve primarily tax-shelter investments and for which the bankruptcy laws have provided a too facile method to relay conditions, but not the operating shopping center and hotel cases where attempts at reorganization should be permitted." Report of the Committee on the Judiciary, United States Senate (to accompany S.2266), S.Rep. No. 989, 95th Cong., 2d Sess. 53 (1978), U.S. Code Cong. & Admin. News 1978, pp. 5787, 5839.

The Senate version did not survive enactment. The Conference report is enlightening in this regard: "This section [§ 362(d)] is intended to solve the problem of real property mortgage foreclosures of property where the bankruptcy petition is filed on the eve of foreclosure. The section is not intended to apply if the business of the debtor is managing or leasing real property, such as a hotel operation, even though the debtor has no equity if the property is necessary to an effective reorganization of the debtor." House Debate on Compromise Bill, 124 Cong.Rec., H 11092–11093 (daily ed. Sept. 28, 1978) (remarks of Rep. Edwards). Thus, in conference, Congress rejected the language of the Senate Bill, but preserved the sense of the explanatory notes from the Senate Report.

"Generally the rejection of an amendment indicates that the legislature does not intend the bill to include the provisions embodied in the rejected amendment. However, such rejection may occur because the bill already includes those provisions." Singer, Vol. 2A, *Sutherland Statutory Construction*, § 48.18, pg. 341 (4th ed. 1984). How should we interpret Congress' rejection of the Senate version of Section 362(d)? Certainly, Congress as a whole shared the Senate's concern that the Bankruptcy Code not be available for wholesale abuse. However, it declined to enact language which would have had the practical result of denying bankruptcy protection entirely to real estate-oriented entities. That reluctance is consistent with the larger purposes of Congress in enacting a single reorganization chapter designed to do the job of no less than four different, more specialized chapters under the Bankruptcy Act.[2] Chapter XII of the Act contained the provisions for arrangements for noncorporate entities involved in real estate. Bankruptcy Act, §§ 401–526, 11 U.S.C. §§ 801–926 (1970). When the Bankruptcy Code was enacted, "Chapter XII of the Bankruptcy Act ... [was] incorporated into the new consolidated chapter. The consolidated chapter is chapter 11 of proposed title 11." H.R. 8200, H.R.Rep. No. 95–595, 95th Cong., 1st Sess., 223–24 (1977), U.S. Code Cong. & Admin. News 1978, p. 6183. Clearly, Congress could not in Section 362 deny to such enterprises the very relief intended to be extended by way of the enactment of new Chapter 11. The better interpretation, then, of the rejection of the Senate's proposed language is that Congress intended to depart from the Senate's intention, rather than that the language ultimately adopted incorporated the sense of the Senate proposal. The preservation of the Senate Report's language in the Conference Report may be taken to be an acknowledgement that, on a case by case basis, courts would be justified in granting relief from the stay in situations such as those described in the report, but that Congress would not *mandate* such relief by statutory enactment.[3]

---

2. The Bankruptcy Act contained four chapters for the reorganization of businesses. These included Chapter X, for large, publicly held companies, Chapter XI, for smaller enterprises in which the primary reorganization would involve the unsecured debt, Chapter XII, for real estate ventures, and Chapter IX, for taxing agencies and instrumentalities. Bankruptcy Act of 1898 (as amended) (Collier pamphl.ed.1976). In addition, there were separate chapters for liquidation, wage earner cases, and railroad reorganizations.

3. More than a few commentators, including some prominent jurists, have acidly criticized Congress' tendency to "half-enact" (by way of legislative history) sentiments which might be strongly held by some contingent but which, for one reason or another, could not attract enough support (or were perhaps too controversial) to actually be enacted. These commentators caution courts not to read too much into such pronouncements when they are engaging in statutory interpretation.

With this background, we can better appreciate that the term "not necessary" at least contemplates excision of those properties that are peripheral to the debtor's operation. By the same token, however, Congress actually *favors* multi-asset real estate enterprises over the single-asset operation, according to the comments of Representative Edwards, militating against an interpretation of "necessary" that would require a real estate enterprise to in all cases slim down to the fewest number of properties needed to repay indebtedness.

Implicit in the notion of reorganization is the preservation of the enterprise which sought bankruptcy protection in the first place. H.R.Rep. No. 595, 95th Cong., 1st Sess. 223–24 (1977). It would be harsh and unrealistic indeed to conclude that Section 362(d) mandated dismemberment of the very enterprise which chapter 11 reorganization is designed to preserve.[4]

■ What is clear from the foregoing is that it will be difficult indeed for any court to draw a bright line to indicate just when a given property is not necessary. Some general principles emerge, however. Certainly, a literal reading of the term must be eschewed as it would lead ineluctably to willy-nilly races to the courthouse. Too, courts should keep in mind the underlying goal of reorganization to, as a general principle at least, preserve the enterprise which sought bankruptcy protection from dismemberment by overeager creditors. It becomes quickly apparent that "necessity" will of necessity be measured against the kind of reorganization contemplated in a given case.[5] Whether property is not necessary will thus turn in large part on the

peculiar facts and posture of the case, and will not admit of a hard and fast rule.

■ The Debtor in this instance operates a number of income producing properties, and has for many years. It is the aggregate value of these properties that give value to the Debtor's overall business. It is the peculiar good fortune of the Debtor in this case that her business fits so nicely into the example used in the Senate and House reports, both of which acknowledge that bankruptcy may be appropriate to management and leasing companies which handle a multitude of properties. Each of her properties generate enough income to cover their own respective expenses and contribute a certain amount of "profit" to the overall business enterprise. Each piece of property could "stand alone" without the assistance of the other pieces as a free-standing, self-sufficient entity. On the other hand, the value of the Debtor's total business comes from the overall accumulation of the earnings (or losses) of each individual component. When viewed as part of an aggregate enterprise, the property bears qualities that tend to support its being necessary for a reorganization that contemplates preservation of that enterprise.

The Debtor is not a company or partnership but an individual. NCNB points that Ms. Fields has enough personal assets to live comfortably in moderation, even without most of the real estate holdings. Were the application of the notion of necessity a moral exercise, one could quickly conclude at this point that the subject property is not necessary to her personal reorganization. However, that analysis largely misses the thrust of reorganization. What Ms.

---

4. Actually, there are two entirely discrete notions of what bankruptcy is all about at war here. One notion presumes that the principle function of bankruptcy is the application of assets to satisfy creditor claims. The other notion elevates the preservation of enterprises as going concerns. NCNB's proposed approach to the interpretation of the term "necessary" is rooted in the former notion. It is not particularly important to which notion this court adheres, for Congress has already settled on the latter, for better or worse. *See* H.R.Rep. No. 595, 95th Cong., 1st Sess. 203–05 (1977).

5. For example, one enterprise might well need to shed all nonincome producing property in order to develop a reorganization plan, while another might, as part of its plan, legitimately contemplate maintaining an inventory of such property for future development. None of this is to suggest that the court should be any less vigilant in evaluating whether a given plan has a reasonable prospect for confirmation within a reasonable period of time, as countenanced by the Supreme Court in *Timbers*.

Fields is really trying to do here is to reorganize her *business,* which just happens to be operated as a sole proprietorship. *See* H.R.Rep. No. 595, 95th Cong., 1st Sess. 205–09, 223–24, 355 (1977).[6] The question needs to be more accurately focused on the need for the property relative to the *business*'s reorganization.

NCNB charges that the subject property can be taken away from the Debtor's assets without jeopardizing the overall success of reorganization, as the Debtor has a multitude of assets that generate income, most of which are admittedly self-sufficient. The major flaw with this analysis is that it applies with equal force to each and every income-producing asset of the Debtor's business. This logic would compel the court to grant relief to every creditor of the respective income producing property, forcing the Debtor's business into inevitable liquidation. Adopting NCNB's reasoning thrusts us back to our air line hypothetical, which, as we earlier saw, leads to absurd results.

Of course, a court is not free to simply hold that all income producing property of a real estate enterprise is *ipso facto* necessary for an effective reorganization. That reading saps all the meaning out of the term. We must examine the nature of the enterprise, the kind of reorganization contemplated, and the role this property plays in the enterprise and its reorganization.[7]

One important feature of this Debtor's business is that it consists largely of income-producing properties. Income production can be a significant factor in concluding that property is "necessary," not simply because the property in question *produces* income, but more largely because the property *contributes to* the income pro-

duction process. *See In re Wilks,* 123 B.R. 555, 559 (Bankr.W.D.Tex.1991) (whether an individual wage earner's homestead is necessary for chapter 11 reorganization). This property easily qualifies in both the specific and the more general sense, for it both produces income and contributes to the enterprise's overall income-producing capabilities.

Another feature of this business is that this particular property has been a mainstay of the Debtor's business for many years now. In fact, she used this property to raise money for other real estate investments. Her plan contemplates shedding some of the very properties she acquired in previous years, using funds borrowed against this asset, thereby paring her enterprise back to its pre-expansion size and scope. The tactic is similar to that used by many other kinds of businesses as part of their bankruptcy reorganization. Some air lines shed routes, some retail merchandise or food chains eliminate stores and locations, some manufacturing enterprises eliminate certain product lines. The kernel of these operations can safely be described as "necessary" within the meaning of Section 362(d)(2)(B), and we should feel just as comfortable with that description when it is applied to the kernel of a real estate operation going through a similar kind of restructuring. Granting NCNB the relief it desires at this stage in the proceeding would tend to undermine the Debtor's effort to preserve the core of her. business intact.

The foregoing considerations, taken together, lead this court to conclude that, in *this* case, *this* property is necessary to *this*

---

**6.** Some courts require that an individual debtor have some sort of business to reorganize in order to qualify for relief under Chapter 11. *See In re Lange,* 75 B.R. 154 (Bankr.N.D.Ohio 1987); *Wamsganz v. Boatmen's Bank of De Soto,* 804 F.2d 503 (8th Cir.1986); *In re Toibb,* 902 F.2d 14 (8th Cir.1990), *cert. granted,* — U.S. —, 111 S.Ct. 775, 112 L.Ed.2d 838 (1991); *but see In re Wilks,* 123 B.R. 555 (Bankr.W.D.Tex. 1991). The Debtor in this instance operates an ongoing business, so she easily fits within foregoing cases.

**7.** We here reiterate that all of this is largely moot if an effective reorganization is impossible in the first place. Our analysis relies on the agreement of the parties in this case that, indeed, there is a realistic prospect for a successful rehabilitation of this debtor within a reasonable period of time. *See United Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd.,* 484 U.S. 365, 108 S.Ct. 626, 632, 98 L.Ed.2d 740 (1988).

Debtor's reorganization.[8] Therefore, NCNB's motion for relief from stay will be DENIED. An Order consistent with this decision will be entered.

---

**8.** The Debtor offered an additional rationale for necessity, but that rationale is not so persuasive, at least not on the facts of this case. Debtor urges that, eventually, this property will throw off income used to satisfy unsecured claims, which the Debtor sincerely maintains she fully intends to pay in full. Unfortunately, the evidence is largely uncontroverted that it would be ten to twelve years before any of that excess income were realized. As a general observa-

tion, if a given property, as part of a plan, is going to generate or contribute to a return for unsecured creditors over and above its own debt service, it will probably pass muster under the necessity test. Here, however, the prospect for a return is thrust so far into the future that no reasonable person could legitimately count on it. Calling a property "necessary" for so speculative a return rises nearly to an oxymoron.