**In re 680 FIFTH AVENUE ASSOCIATES, Debtor.**

**In re 54TH AND FIFTH LAND PARTNERS, Debtor.**

**680 FIFTH AVENUE ASSOCIATES, 54th and Fifth Land Partners, Plaintiffs,**

v.

**The MUTUAL BENEFIT LIFE INSURANCE COMPANY IN REHABILITATION, Defendant.**

**Bankruptcy Nos. 92–B–44734, 92–B–44735. Adv. No. 92–1032A.**

United States Bankruptcy Court, S.D. New York.

June 17, 1993.

See also 154 B.R. 38.

M. Muschel and J. Levitan, of Proskauer Rose Goetz & Mendelsohn, New York City, for 680 Fifth Avenue Associates ("680 Associates") and 54th and Fifth Land Partners ("Land Partners").

E.D. Robertson and R. Loughrey, of Cadwalader, Wickersham & Taft, New York City, for The Mutual Ben. Life Ins. Co. in Rehabilitation ("MBLI").

D. Costa, of Berlack Israels & Liberman, New York City, for the Creditors Committee.

## MEMORANDUM OF DECISION ON MOTIONS FOR SUMMARY JUDGMENT UNDER 11 U.S.C. § 1111(b)

FRANCIS G. CONRAD, Bankruptcy Judge.[*]

This declaratory judgment proceeding[1] is before us on cross motions for summary

judgment and for judgment on the pleadings. 680 Associates seeks a declaration that MBLI's allowable secured claim is limited to the value of the land and building located at 680 Fifth Avenue, New York, New York and that 11 U.S.C. § 1111(b) is inapplicable to secured creditors not in privity with the debtor. MBLI claims that the plain meaning of § 1111(b) prohibits 680 Associates from "stripping down" MBLI's mortgage lien.

On March 18, 1993, we heard oral argument on the cross motions and issued a bench ruling granting summary judgment in favor of MBLI. In particular, we held that § 1111(b) applies to both consensual and nonconsensual nonrecourse liens on property of the estate, regardless of whether there is privity between the debtor and the secured creditor. This Memorandum of Decision sets forth, in greater detail, the reasoning behind our March 18, 1993 ruling.

### BACKGROUND

On August 24, 1990, 680 Associates and Land Partners filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 101 *et seq.* By order dated August 27, 1992, the two cases are jointly administered.

On October 23, 1992, 680 Associates and Land Partners commenced a declaratory judgment action alleging that MBLI's secured claim is limited to the value of the building and land located at 680 Fifth Avenue, New York City. On March 1, 1993, 680 Associates and Land Partners moved for summary judgment or alternatively for judgment on the pleadings. MBLI cross moved for summary judgment.

The relevant facts are not in dispute. Given the complex factual history of this case and the elaborate tax shelter giving rise to the dispute now before us, we limit our findings of fact essentially to those stipulated by the parties.

680 Associates is a New York limited partnership with its principal place of business in New York City. 680 Associates

---

[*] Sitting by special designation.

1. Our subject matter jurisdiction over this controversy arises under 28 U.S.C. § 1334(b) and the "Standing Order of Referral of Cases to Bankruptcy Judges" of the United States District Court for the Southern District of New York,

dated July 10, 1984 (Ward, Acting C.J.). This is a core matter under 28 U.S.C. § 157(b)(2)(C) and (O). This Memorandum of Decision constitutes findings of fact and conclusions of law under F.R.Civ.P. 52, as made applicable by F.R.Bankr.P. 7052.

owns and operates a twenty-seven story office building (the "Building") located on the southwest corner of Fifth Avenue and 54th Street in New York City.

Land Partners is a New Jersey limited partnership with its principal place of business in New York City. Land Partners owns and leases the real property located at Fifth and 54th Street (the "Real Property").

MBLI is an insurance company organized under New Jersey law and located in Newark, New Jersey.

On August 5, 1983, MBLI agreed to sell the Real Property and the Building to 680–54 Corporation ("Corporation") for $9,505,-000 in cash (the "Mutual Benefit Contract"). The parties also agreed that a purchase money mortgage between Corporation as mortgagor and MBLI as mortgagee would continue to encumber the Real Property after the sale, and that Corporation would pay all indebtedness under the purchase money mortgage. The closing for the sale and conveyance of the deed (the "Real Property Deed") occurred on November 7, 1983. Corporation later conveyed the Real Property Deed to Land Partners.

On August 5, 1983, according to a sale agreement between 680–54 Corp. and S.G. Feldman, Inc. ("Feldman"), Feldman agreed to purchase the Real Property from Corporation. In a separate contract, Land Partners succeeded to the rights and obligations of Feldman's successor in interest, CRC Land Lease Corporation.

Under a contract dated August 5, 1983, Corporation agreed to sell the Building to Oak Tree Realty Corporation ("Oak Tree"), successor in interest to CFL Realty Corporation. In a separate agreement dated October 20, 1983, Oak Tree sold the Building to 680 Associates for a purchase price of $40,500,000, of which $500,000 was paid at closing, with the remainder ($40,000,000) to be paid according to 680 Associates' execution and delivery of a purchase money note and mortgage to Oak Tree.

On August 5, 1983, Land Partners and 680 Associates agreed to assume some of Corporation's obligations under the Mutual Benefit Contract. Land Partners and 680 Associates did not assume Corporation's indebtedness under any of the relevant purchase money notes or mortgages, nor did Land Partners or 680 Associates execute any debt instruments in favor of MBLI, although Land Partners and 680 Associates acquired their interests in the Real Property and the Building subject to the applicable purchase money mortgage.

MBLI, 680 Associates, and Land Partners have stipulated that for the purposes of their cross motions for summary judgment, the purchase money note and purchase money mortgage held by MBLI are in default and that the security interest arising under the purchase money mortgage is properly perfected. The parties also agree that for the purposes of the present motions, MBLI's lien on the Real Property is valid and enforceable. Finally, the parties stipulate that the value of the Real Property is less than the amounts owed on the purchase money note and purchase money mortgage. MBLI is therefore undersecured.

## DISCUSSION

This declaratory judgment dispute between the parties raises several issues concerning the breadth and meaning 11 U.S.C. § 1111(b). Although the nuances of § 1111(b) are infamous in bankruptcy circles, the statute generally prevents a debtor from stripping down undersecured liens in Chapter 11 and provides that all liens in Chapter 11 cases are created equal, regardless of their recourse or nonrecourse attire.

The procedural posture of this adversary proceeding is as follows. We have jurisdiction under Federal Rules of Bankruptcy Procedure 7001(9) to determine the rights and duties of the parties by declaratory judgment if there is an "actual controversy." *See*, 28 U.S.C. § 2201. The test of justiciability under this statute is "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Casualty Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941). The present adversary proceeding satisfies these requirements.

Both MBLI and 680 Associates have filed motions for summary judgment on the issue of whether § 1111(b) applies to nonconsensual, nonrecourse liens. On cross motions for summary judgment, the court must determine whether one of the parties

is entitled to judgment as a matter of law on the basis of the undisputed facts. *In re Drexel Burnham Lambert Group, Inc.,* 138 B.R. 687, 694 (Bankr.S.D.N.Y.1992) (citation omitted).

The standards for summary judgment are well known. To prevail in a motion for summary judgment, the movant must satisfy the criteria set forth in Fed.R.Civ.P. 56, as made applicable to this Court under F.R.Bankr.P. 7056. Rule 56 provides, in pertinent part:

> [T]he judgment sought shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

*See, Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Eastman Machine Company, Inc. v. United States,* 841 F.2d 469 (2d Cir. 1988). The primary purpose for granting a summary judgment motion is to avoid unnecessary trials when no genuine issue of material fact is in dispute. Here, the parties have stipulated that no relevant facts are in dispute. The issues presented are therefore ripe for summary judgment. With these procedural standards in mind, we next proceed to the merits of 680 Associates' declaratory judgment proceeding.

The arguments of the parties are as follows. 680 Associates asserts that the sole allowable claim of MBLI is a secured claim equal to the value of the Lien, and that the amount of the claim equals the value of the Property. Although MBLI is undersecured, 680 Associates claims that MBLI has no unsecured claim because § 506(a) provides only an undersecured recourse lender with a deficiency claim in a Chapter 11 case. 680 Associates also argues that § 1111(b) does not apply to the present set of facts because MBLI is not in privity with the debtor and because MBLI's lien does not have the relevant attributes of a nonrecourse claim.[2]

MBLI argues that its lien entitles it to the benefits of § 1111(b) regardless of MBLI's relationship with the debtor and the nonconsensual manner in which its nonrecourse lien arose. MBLI asserts that Congress enacted § 1111(b) to prevent lien stripping in Chapter 11 cases, and that the statute's plain meaning refutes the debtor's position. MBLI concludes that it is entitled under §§ 102(2), 506(a), and 1111(b) to a choose between bifurcating its claim into secured and unsecured parts or electing fully secured status.[3]

We begin our analysis with a review of the relevant provisions of the Bankruptcy Code. In Chapter 11, § 1111(b) determines the treatment of undersecured claims secured by liens on property of the estate. Although its origins are somewhat obscure, commentators have generally agreed that Congress enacted § 1111(b) to correct perceived abuses occurring under Chapter XII of the Bankruptcy Act of 1898 ("the Act"). The Act provided certain debtors with a cramdown power that reduced undersecured claims to the value of the collateral.[4]

The Act's cramdown provision was particularly frustrating for nonrecourse lenders. One case, *In re Pine Gate Associates, Ltd.,* 2 Bankr.Ct. Dec. 1478 (Bankr.N.D.Ga. 1976), is widely believed to have been the catalyst that prompted Congress to improve the position of nonrecourse lenders under Chapter 11 in comparison with their treatment under the Act.[5] In *Pine Gate,* the court confirmed a plan that permitted the debtor to retain ownership of the property by paying the appraised value of the collateral to the undersecured, nonrecourse creditor. Lenders reacted negatively to the *Pine Gate* decision because the absence of a public sale prevented the mortgagee from bidding in its liens, and the nonrecourse nature of the loan barred the lender from asserting an unsecured deficiency claim.

In response to *Pine Gate,* Congress created § 1111(b) to address the concerns of the lending community. Section 1111(b) changes pre-Code law in three key ways.

---

**2.** March 18, 1993 Trial Transcript, 13–21.

**3.** March 18, 1993 Trial Transcript, 18–19.

**4.** The cramdown power in Chapter XII provided that following an appraisal of the collateral, a

debtor could pay the appraisal amount in cash and satisfy the secured creditor's total claim. 11 U.S.C. § 461(11)(c) (repealed).

**5.** Numerous commentators have written that the holding in *In re Pine Gate* was the impetus

First, § 1111(b) states that all liens encumbering property of the debtor are treated as recourse, regardless of whether the creditor's lien was recourse or nonrecourse under nonbankruptcy law. Second, regardless of the terms of the loan and applicable nonbankruptcy law, § 1111(b) allows an undersecured nonrecourse creditor to split its claim into a secured claim equal to the value of the collateral and an unsecured claim for the deficiency. Third, § 1111(b)(2) permits an undersecured creditor to elect to have its claim treated as fully secured in a plan that provides for the debtor's retention of the collateral. As stated by Bankruptcy Judge Brozman in *In re 500 Fifth Avenue Associates*, 148 B.R. 1010, 1021 (Bankr.S.D.N.Y.1993), Congress enacted § 1111(b) to give undersecured creditors "a voice in the Chapter 11 process to the extent that the "undersecured creditor [may] dominate the vote within the unsecured class ..." (citation omitted).

 Under § 1111(b), the undersecured lienholder may waive its deficiency claim and, notwithstanding § 506, elect that the claim be treated as secured to the full extent of the debt, or the lienholder may choose to have its claim bifurcated into secured and unsecured portions. In deciding between fully secured treatment and claim bifurcation, the lienholder will consider numerous variables unique to its particular circumstances, including the percentage distribution to unsecured deficiency claimants, the present value of secured treatment versus bifurcated treatment of the claim, and the likelihood that the collateral will appreciate post-confirmation.[6]

 To understand the many complexities of § 1111(b), we first review § 506(a)

and (d). *See, In re 500 Fifth Avenue Associates, supra,* 148 B.R. at 1021; *In re 266 Washington Associates,* 141 B.R. 275, 283 (Bankr.E.D.N.Y.1992), *aff'd,* 147 B.R. 827 (E.D.N.Y.1992). Under § 506(a), a lender's secured claim is limited to the value of its collateral; any difference between the amount of the debt and the value of the collateral is deemed an unsecured claim. *In re 500 Fifth Avenue Associates, supra,* 148 B.R. at 1016. Section 506(a) provides, in pertinent part:

An allowed claim of a creditor secured by a lien on property in which the estate has an interest ... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property ... and is an unsecured claim to the extent that the value of such creditor's interest ... is less than the amount of such allowed claim.

Section 506(a) therefore bifurcates an allowed undersecured claim into secured and unsecured portions.[7] An undersecured creditor has both a secured claim equal to the value of the collateral and an unsecured deficiency claim for the remainder. If the claim is nonrecourse, the secured creditor's claim is capped at the value of the collateral under § 506(d). Section 506(d) provides:

(d) To the extent that a lien secures a claim against a debtor that is not an allowed secured claim, such lien is void, unless—

(1) such claim was disallowed only under section 502(b)(5) or 502(e) of this title; or

(2) such claim is not an allowed secured claim due only to the failure of any entity to file a proof of such claim under section 501 of this title.

---

for § 1111(b). *See,* M. Howard, Stripping Down Liens: Section 506(d) and the Theory of Bankruptcy, 65 Am.Bankr.L.J. 373, 399 (1991); D. Carlson, Undersecured Claims Under Bankruptcy Code Sections 506(a) and 1111(b): Second Looks at Judicial Valuations of Collateral, 6 Bankr.Dev.J. 253, 281 (1989); J. Green, Avoiding Recourse Under 11 U.S.C. § 1111(b)(1)(A)(ii): Conflicts With 11 U.S.C. § 363, 10 Okla. City U.L.Rev. 645 (1985).

**6.** Whether or not the secured creditor exercises his or her election under § 1111(b) determines the amount of the secured claim for purposes of

cram down under 11 U.S.C. § 1129(b)(2)(A). If the creditor elects secured status to the full extent of his or her allowed claim, the debtor must make payment totaling at least the amount of the secured claim and having a present value of at least the value of the collateral. *See,* M. Howard, Stripping Down Liens: Section 506(d) and the Theory of Bankruptcy, Am.Bankr.L.J. 373, 398, n. 108 (1991), *citing,* C. Fortgang and D. Mayer, Valuation in Bankruptcy, 32 U.C.L.A.L.Rev. 1061, 1115 (1985).

**7.** The effect of § 506 bifurcation on the secured creditor has been a topic of debate in recent

In general, § 1111(b) furnishes two exceptions to the general rule for valuation of collateral contained in § 506(a). *See*, 5 L. King, *Colliers on Bankruptcy* ¶ 1111.02 at 1111–19 (15th ed. 1993). Section 1111(b) provides, in pertinent part:

> (1)(A) A claim secured by a lien on property of the estate shall be allowed or disallowed under section 502 of this title the same as if the holder of such claim had recourse against the debtor on account of such claim, whether or not such holder has such recourse, unless
>
> > (i) The class of which such claim is a part elects ... application of paragraph (2) of this subsection....
>
> (2) If such an election is made, then notwithstanding section 506(a) of this title, such claim is a secured claim to the extent that such claim is allowed.

 Section 1111(b)(1)(A) treats a claim secured by a lien on property as recourse regardless of whether the underlying transaction or applicable law provides for recourse.[8] A nonrecourse creditor is a creditor who has agreed to look only to its collateral for satisfaction of its debt and does not have any right to seek payment of any deficiency from a debtor's other assets. *See*, *In re Dan Hixson Chevrolet Co.*, 20

cases. The Supreme Court held in *Dewsnup v. Timm*, —— U.S. ——, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992), that Chapter 7 debtors may not strip down liens against property of the estate because "liens pass through bankruptcy unaffected." *See Johnson v. Home State Bank*, 501 U.S. ——, 111 S.Ct. 2150, 115 L.Ed.2d 66 (1991). Lien stripping in Chapter 13 is also not permitted. *Nobelman v. American Sav. Bank*, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993) (holding that § 1322(b)(2) prohibits a Chapter 13 debtor from relying on § 506(a) to reduce an undersecured homestead mortgage to the fair market value of the mortgaged residence).

Chapter 13 does not, however, contain a section that parallels § 1111(b). Given the Supreme Court's recent *Nobelman* decision in the context of Chapter 13 and the unique statutory goals favoring reorganization in Chapter 11, it is unclear whether the Supreme Court will apply its holding in *Dewsnup* to Chapter 11 cases. *See Dewsnup*, 112 S.Ct. at 778 ("hypothetical applications that come to mind and those advanced at oral argument illustrate the difficulty of interpreting the statute in a single opinion that would apply to all possible fact situations. We therefore focus upon the case and allow other facts to await their legal resolution on another day"). The Supreme Court limited its holding to the facts and circumstances of the *Dewsnup* case, and lower courts generally state that *Dewsnup* does not apply to Chapter 11 cases. *In re Jones*, 152 B.R. 155, 173–74 n. 24 (Bkrtcy. E.D.Mich.1993) (if the holding in *Dewsnup* were applied to a Chapter 11 case, the § 1111(b) election would become superfluous); *In re Butler*, 139 B.R. 258, 259 (Bkrtcy.E.D.Okla.1992); Bogdanoff, *The Purchase and Sale of Assets in Reorganization Cases—Of Interest and Principal, of Principles and Interests*, 47 Bus.Law. 1367, 1455–1458 (1992). *Contra, In re Blue Pacific Car Wash, Inc.*, 150 B.R. 434 (W.D.Wis.1992).

Although the issue is open to interpretation, at least two arguments support the conclusion that lien stripping in Chapter 11 cases exists. First, to satisfy the cram down requirements in § 1129(b), a Chapter 11 plan need provide for the retention of liens only up to the value of the secured creditor's collateral. Section 1129(b)(2)(A)(i)(I) states that the holders of secured claims must "retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims." The lien that the plan must preserve must only collateralize a "secured claim" as defined in § 506(a). There is no requirement that the lien exceed the collateral's value. *See* Bogdanoff, *supra*, 47 Bus.Law. at 1457. Second, the fact that the § 1111(b) election exists at all presumes that debtors possess the authority under the Code to limit secured claims to the value of the collateral. The election allows an undersecured creditor to opt out of the lien-stripping found in § 1129 in exchange for relinquishing its deficiency claim, retaining its lien for the full amount of its claim, and receiving payments totalling the entire allowed claim and having a present value equal to the secured amount. *See* Bogdanoff, *supra*, 47 Bus.Law. at 1457. Bogdanoff reasons as follows:

> If, on the contrary, the undersecured creditor's lien were preserved under section 1129(b) to the extent the underlying claim were allowed, there would be no reason to offer the undersecured creditor the 1111(b) election. The lien would endure regardless of the creditor's decision, and no "election" would be held at all.

*Id.* As Justice Scalia noted in his dissenting opinion in *Dewsnup*, a creditor electing under § 1111(b) "is guaranteed under the reorganization plan only 'property of a value, as of the effective date of the plan, that is not less than the value of such holder's interest in the estate's interest in the property that secures such claims.'" *Dewsnup*, —— U.S. ——, ——, n. 3, 112 S.Ct. 773, 785, n. 3 (Scalia, J., dissenting, *quoting* 11 USC § 1129(a)(7)(B)). In other words, the present value of the payments to the electing creditor must only equal the value of the secured creditor's interest in the collateral. *Id.* (citation omitted).

**8.** The two exceptions listed in § 1111(b)(1)(B) have not been put in issue and therefore play no part in this decision.

B.R. 108, 110–111 (Bankr.N.D.Tex.1982) (nonrecourse means that the lienor may look only to the property subject to his lien to satisfy his debt and cannot look to the debtor personally for payment.) A recourse creditor has the right to seek payment of a deficiency in the value of its collateral from the debtor's other assets. C. Averch and M. Collins, Norton Bankruptcy Law Advisor, May 1993, 3, citing, Nelson and Whitman, Real Estate Finance Law § 2.1, 18–19 (2d ed. 1985).

The following illustration explains the effect of § 1111(b)(1)(A). If a nonrecourse lender advances $1 million secured by collateral worth $100,000, at confirmation, the nonrecourse lender gets its secured claim for $100,000 and a bonus—an unsecured claim for $900,000. This bonus is subject to two exceptions. First, if the plan of reorganization provides that collateral is to be sold, the undersecured creditor does not get recourse because the nonrecourse lender may, under 11 U.S.C. § 363(k), bid in the undersecured portion of its claim when the collateral is sold.[9] A similar result occurs if the debtor in possession abandons the property to the creditor, or if the property is sold under the plan of reorganization. Second, under § 1111(b)(2), the undersecured creditor may elect to have its claim treated as fully secured, regardless of whether the value of the underlying collateral equals the value of the claim. *See* 5 L. King, *Colliers on Bankruptcy* ¶ 1111.02 at 1111–15, 1111–16 (15th ed. 1993) (citing 124 Cong.Rec. H11, 103–104 (daily ed., Sept. 28, 1978); 124 Cong.Rec. S17,420 (daily ed., Oct. 6, 1978)).

Section 1111(b)(2) allows an undersecured creditor to continue to be treated as fully secured under a plan of reorganization that provides for a debtor's retention of the lienholder's collateral. An undersecured creditor may elect under § 1111(b)(2) only if the collateral is not of inconsequential value and (if the creditor is a recourse creditor) the collateral is not sold under § 363 of the Code or under the plan of reorganization.

Under § 1111(b)(2), a claim is treated as nonrecourse to the full value of the claim. A creditor therefore forfeits its right to vote on the plan because there is no undersecured deficiency claim and the secured claim is unimpaired. At confirmation, the debtor must pay the secured creditor either the value of its true secured claim in full, i.e., the value of the collateral, or the value of its true secured claim over time with interest so that the stream of payments has a present value equal to the value of the true secured claim at confirmation, plus an amount equal to the unsecured portion of the debt as valued at confirmation without regard to the present value. At a minimum, the deferred payments must equal the value of the total claim if the creditor makes a § 1111(b)(2) election.

To determine the applicability of § 1111(b) in this case, we first must determine the nature of MBLI's claim. According to the stipulated facts, MBLI's claim arose from the sale of the Real Property and Building to an entity which, when it received them, had already split the land and building and sold them to others which, in turn, sold them to still others. Also according to the stipulated facts, MBLI has a nonrecourse mortgage interest in the

---

**9.** Section 363(k) provides as follows:

At a sale ... of property that is subject to a lien that secures an allowed claim, unless the court for cause orders otherwise the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property.

When property is sold under § 363(k), a nonrecourse creditor has the opportunity to bid in its lien and therefore receive the benefit of its contractual bargain. *Cf. H & M Parmely Farms*

*v. Farmers Home Administration,* 127 B.R. 644, 648 (D.S.D.1990) (where a Chapter 11 plan contemplates liquidation of certain assets, the intent of § 363(k) is to notify the creditor of the upcoming sale of the collateral and allow it to reap the benefits of its bargain); *John Hancock Mutual Life Ins. Co. v. California Hancock, Inc. (In re California Hancock, Inc.),* 88 B.R. 226 (Bankr. 9th Cir. BAP 1988) (debtor's plan of reorganization could not be confirmed when the lienholder was not permitted to credit bid).

Real Property.[10] 680 Associates acquired the property subject to MBLI's mortgage without assuming any obligation on the underlying note. The value of MBLI's claim is approximately $53 million.[11]

 The plain meaning rule of statutory construction supports MBLI's position, and, indeed, requires that we decide in favor of MBLI. The Supreme Court has stated that when the language of the Bankruptcy Code is clear and unambiguous, the plain meaning controls issues of statutory interpretation, except in the "rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of the drafters." *United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 242, 109 S.Ct. 1026, 1031, 103 L.Ed.2d 290, 299 (1989), *quoting, Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982). If the statute is ambiguous, then courts may consult the legislative history to interpret the statute's meaning to resolve the dispute.[12]

The plain meaning of § 1111(b) does not limit itself to consensual or nonconsensual liens. Moreover, § 1111(b) is not limited to nonrecourse loans or to claims where the lienholder is in privity with the debtor. The only precondition to the statute's application is a claim secured by a lien on property of the estate. Clearly, MBLI has such a lien which entitles it to be treated "as if [it] had recourse against the debtor."

**10.** Generally, a creditor is not limited to foreclosure on the property, unless the debtor and its creditor agree otherwise. A secured creditor may sue to establish the debtor's personal liability and may enforce any judgment against the debtor's assets. *See, Johnson v. Home State Bank,* —— U.S. ——, 111 S.Ct. 2150, 2153, 115 L.Ed.2d 66 (1991), *citing,* 3 R. Powell, The Law of Real Property, 467 (1990)).

**11.** March 18, 1993 Trial Transcript, 33.

**12.** We note that the Supreme Court has redefined its support of the plain meaning rule in recent cases involving bankruptcy issues. For example, in *Johnson v. Home State Bank,* —— U.S. ——, —— – ——, 111 S.Ct. 2150, 2153–2154, 115 L.Ed.2d 66 (1991), the Supreme Court unanimously construed a "claim" in bankruptcy according to the "text, history, and purpose of the Bankruptcy Code" without an initial determination that the Code's definition of a claim was ambiguous. And in *Dewsnup v. Timm,* —— U.S. ——, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992), the Supreme Court reiterated its earlier remarks that Congress does not write on a clean slate when it amends the bankruptcy laws and that the Court is reluctant to interpret the Bankruptcy Code, even in the face of vague statutory language, to effect a major change in pre-Code practice that is not discussed in some detail in the legislative history. Notwithstanding what appear to be arguably contradictory analyses in *Johnson, Ron Pair,* and *Dewsnup,* in the absence of a statutory ambiguity and as a general rule, the Court looks to the language alone as its touchstone of statutory construction.

Under the plain meaning rule, the process is simple. If the language of the statute is unambiguous, courts then review the statutory language in a vacuum, guided only by the common usage of the words therein. If the language is ambiguous, then courts may consult legislative history to determine the intent of the legislature. In bankruptcy cases, the Supreme Court applies two additional standards once it determines that a Bankruptcy Code section is ambiguous: if a principle of bankruptcy law existed prior to the enactment of the Bankruptcy Code, then that principle of law survives the enactment of the Code if (1) the Code would effect a major change in pre-Code practice; and (2) the change was not discussed in the legislative history of the Code. *See, Dewsnup v. Timm, supra,* —— U.S. at ——, 112 S.Ct. at 779.

Fondness for the plain meaning rule is easy to understand. Much like Berowne in Shakespeare's *Love's Labour's Lost* who mused "light, seeking light, doth light of light beguile," courts are generally loathe to undertake detailed analyses of legislative history only to reach the unwanted conclusion that their endeavors raise more questions than answers.

Unfortunately, plain meaning is often limited by what one commentator refers to as the "disorderly conduct of words" or, even worse, the common example of a factual situation or argument not considered at all when the statute was created but nevertheless implicated in the statute's general application. For these and other reasons, courts cannot place their complete trust in the plain meaning of a given statute in the majority of cases involving statutory interpretation. When Congress or any other legislative body creates a statute, it acts to remedy a problem confronting society. The legislative response is necessarily a general one because government cannot foresee the many factual circumstances that inevitably follow the statute's enactment. Ideally, courts should, when contemplating the meaning of a statute in the narrow framework of a given case, look to the purpose of a statute to determine whether the facts presented fall either within or without the legislative mandate.

The broad definition of claims in bankruptcy also supports MBLI's position. Under the Bankruptcy Code, a claim is broadly defined as

[a] right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured....

11 U.S.C. § 101(5). According to the Supreme Court, Congress intended this language to adopt the broadest possible meaning of a claim in bankruptcy. *See, Pennsylvania Dept. of Public Welfare v. Davenport*, 495 U.S. 552, 110 S.Ct. 2126, 109 L.Ed.2d 588 (1990). The Supreme Court has also stated that a mortgage holder has a claim even where the debtor has no personal obligation to pay. *Johnson v. Home State Bank, supra*, — U.S. at —, 111 S.Ct. at 2154. Accordingly, a court must allow the claim if it is enforceable against either the debtor or his property. *Id.* at —, 111 S.Ct. at 2155.

Section 102(2) [13] further establishes that a claim against the property of a debtor is a claim against the debtor. "A fair reading of § 102(2) is that a creditor who ... has a claim enforceable only against the debtor's property nonetheless has a 'claim against the debtor' for purposes of the Code." *Johnson v. Home State Bank, supra*, — U.S. at —, 111 S.Ct. at 2154. Moreover, the Supreme Court has reasoned that § 102(2) includes nonrecourse liens regardless of their origin:

[I]nsofar as Congress did not expressly limit 102(2) to nonrecourse loans but rather chose general language broad enough to encompass [all] such obligations, we understand Congress' intent to be that 102(2) extends to all interests having the relevant attributes of nonrecourse obligations regardless of how those interests came into existence.

**13.** 11 U.S.C. § 102(2) provides that a "'claim against the debtor'" includes [a] claim against property of the debtor."

**14.** Although we find that the relevant statutes are clear and unambiguous, we note that the legislative history of 11 U.S.C. § 1129(b) supports our ruling in favor of MBLI. In reference

*Id.* at —, 111 S.Ct. at 2155. MBLI therefore has a valid claim regardless of whether 680 Associates and MBLI agreed to a recourse or nonrecourse lien.

680 Associates attempts to distinguish *Johnson* because MBLI's nonrecourse claim arose by operation of law rather than by agreement. This distinction, however, fails as a matter of law. Congress did not limit § 102(2) to consensual liens.[14] Instead, Congress adopted broad language encompassing all claims against property of the debtor. *Johnson*, — U.S. at —, 111 S.Ct. at 2155. Section 102(2) "extend[s] to all interests having the relevant attributes of nonrecourse obligations regardless of how these interests came into existence." *Id.*

*Johnson* is consistent with previous cases addressing nonrecourse debt arising from nonconsensual loan arrangements. In *In re Wells*, 125 B.R. 297 (Bankr.D.Col. 1991), the court ruled that a creditor with a mortgage on property that Chapter 13 debtors later inherited held a claim against the bankruptcy estate under 11 U.S.C. §§ 101(5) and 102(2). Similarly, in *Matter of N.R.G. Investments, Inc.*, 99 B.R. 475 (Bankr.M.D.Fla.1989), the court held that a nonrecourse claimant in a chapter 11 case may make a § 1111(b) election). And in *In re Ligon*, 97 B.R. 398, 402–403 (Bankr. N.D.Ill.1989), the court held that in a Chapter 13 case, a nonconsensual nonrecourse lien is a claim against the debtor as defined in 11 U.S.C. § 102(2).

Given Congress' intent to broadly define "claim" and the plain meaning of § 1111(b), we find that MBLI's nonrecourse lien on property of the debtor entitles it to the benefits of § 1111(b), regardless of whether the lien arose by operation of law or by consent.

to § 1111(b), the sponsors of Public Law No. 95–598 commented that "a secured claim is to be treated as a recourse claim in Chapter 11 *whether or not the claim is non-recourse by agreement or applicable law.*" 124 Cong.Rec. S17, 420 (daily ed., Oct. 6, 1978) (emphasis ours).

736

## CONCLUSION

For the foregoing reasons, MBLI's cross motion for summary judgment is granted and 680 Associates' motion for summary judgment is denied.

MBLI shall settle an order on five days notice consistent with this Memorandum of Decision.