In re Stephen and Susan **DEVER,** Debtors and Debtors in Possession.

Stephen and Susan **DEVER,** Plaintiffs,

v.

The **INTERNAL REVENUE SERVICE,** and the **California Franchise Tax Board,** Defendants.

Bankruptcy No. LA–91–14114–LF. Adv. No. LA–92–03426–LF.

United States Bankruptcy Court, C.D. California.

Feb. 4, 1994.

Scott C. Clarkson, Clarkson, Lever & Cohn, Torrance, CA, for Stephen and Susan Dever.

Debra Lynn Reale and Irene Scott Carroll, Special Assts. to the U.S. Atty., Los Angeles, CA, for the I.R.S.

LISA HILL FENNING, Bankruptcy Judge.

## I. INTRODUCTION

The issue before this Court on cross-motions for summary judgment is whether consumer debtors can use Section 506 of the Bankruptcy Code to "strip down" tax liens on their house in a Chapter 11 case. The Internal Revenue Service (IRS) argues that the holding in *Dewsnup v. Timm*, 502 U.S. ——, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992), should be extended to Chapter 11 cases to preclude "lien stripping" because *Dewsnup* held that Chapter 7 debtors cannot use Section 506 for that purpose. The Supreme Court, however, expressly reserved the question as to the applicability of its ruling to cases under the reorganization chapters. *Id.* 502 U.S. at ——, 112 S.Ct. at 778. No case at the circuit level has directly addressed the question in the Chapter 11 context since *Dewsnup*. The few lower court decisions on the subject have split.

The issue of lien stripping in Chapter 11 is presented here in particularly stark terms, because the debtors converted their Chapter 7 case to Chapter 11 specifically to avoid the *Dewsnup* result. Thus, the question is whether they can accomplish in a converted Chapter 11 what the Supreme Court has prohibited in the original Chapter 7 case. For the reasons set forth below, this Court concludes that *Dewsnup*'s holding cannot be imported into Chapter 11 cases without eviscerating other key provisions and principles of that reorganization chapter. Being loath to undermine the Chapter 11 statutory framework without compelling cause, this Court holds that Section 506 permits Chapter 11 debtors to strip down liens on real property under a plan.

## II. FACTUAL BACKGROUND

Stephen and Susan Dever (the "debtors") filed a Chapter 7 petition to deal with income tax liabilities arising from a disastrous investment in a tax shelter. Their principal objective was to void the statutory liens that the Internal Revenue Service ("IRS") and the California Franchise Tax Board ("CFTB") had placed on all of their property, including their home which they hoped to retain. The *Dewsnup* decision interfered with that plan. To sidestep the apparent barrier interposed by *Dewsnup*, debtors converted their case to Chapter 11. Conversion to Chapter 13 was unavailable, since their

total debts exceeded the eligibility limits for that chapter.

Debtors have now proposed a plan that revests the house in their names subject to three trust deeds. The trust deeds have been kept current from their earnings as an automobile mechanic and a school teacher. The plan offers to transfer all personal property subject to the tax liens—including furniture and other exempt property—to the IRS on account of the unpaid tax obligations. The debtors propose to pay nothing to the general unsecured creditors of the estate, who would of course receive nothing under a Chapter 7 liquidation either. Only the IRS has objected to the plan, due to the proposed treatment of its claim as unsecured.

Promptly after converting the case to Chapter 11, debtors filed a complaint to determine the secured status and avoid the liens of the IRS and CFTB under 11 U.S.C. § 506. The CFTB has since settled with the debtors, consenting to its proposed treatment under the plan. The IRS moved for summary judgment on the ground that *Dewsnup* barred avoidance of a lien on property to be retained by the debtors in all cases, not just those under Chapter 7. The debtors also moved for summary judgment, countering that *Dewsnup* should not be extended to Chapter 11 cases.

It is undisputed that the fair market value of the debtors' home is $277,000.00, slightly above the median value for Los Angeles-area homes. The outstanding balance on the first and second trust deeds totals approximately $250,000.00. The only disputed issues of fact concern the validity of the $35,000.00 third trust deed against the property held in the name of debtor's mother, allegedly on account of funds advanced by all of the debtors' parents for the downpayment on the house. Even if that lien were determined to be entirely invalid, however, the $140,000.00–plus junior lien recorded by the IRS would not be fully secured by the remaining $27,000.00 in equity in the property. The IRS lien is either totally unsecured (if the third trust deed is valid), or grossly undersecured (if that deed is invalid). Therefore, partial summary adjudication is appropriate on the question of the avoidability under Section 506

of whatever portion of the IRS lien exceeds the equity value remaining in the property after accounting for the valid senior trust deeds.

## III. DISCUSSION

### A. *Lien–Stripping in Chapter 7 Cases*

The question presented here is the proper interpretation and application of Section 506 of the Bankruptcy Code. Section 506(a) provides in relevant part:

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest ... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, ... and is an unsecured claim to the extent that the value of such creditor's interest ... is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

The conventional wisdom both pre- and post-*Dewsnup* has been to interpret this section as follows:

> Under the Bankruptcy Code, a creditor that has an allowed claim on collateral with a value *less* than the amount owed on that claim holds two claims: a secured claim equal to the value of the collateral, and an unsecured claim for the excess of the claim over the value of the collateral. 11 U.S.C. § 506(a); *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 239, 109 S.Ct. 1026, 1029, 103 L.Ed.2d 290 (1989).

*In re Midway Partners*, 995 F.2d 490, 494 (4th Cir.1993) (emphasis in original; footnotes omitted) (bifurcating claim and avoiding lien in Chapter 7 case). *See,* Kenneth N. Klee, *All You Ever Wanted to Know About Cram Down ·Under the New Bankruptcy Code*, 53 Am.Bankr.L.J. 133, 151 (1980); 3 *Collier's on Bankruptcy* ¶ 506.07, at p. 506–71 (15th ed. 1992).

If a claim is determined to be undersecured and therefore subject to bifurcation under Section 506(a), Section 506(d) provides that:

To the extent that a lien secures a claim against the debtor that is not an allowed secured claim, such lien is void unless—

(1) such claim was disallowed only under section 502(b)(5) or 502(e) of this title; or

(2) such claim is not an allowed secured claim due only to the failure of any entity to file a proof of such claim under section 501 of this title.

Before *Dewsnup*, Section 506(d) had been generally understood to mean that a debtor or trustee could ask the court to void a lien associated with an undersecured claim to the extent that it exceeded the amount of the allowed secured claim, thereby limiting the lien to the secured portion. *See, e.g., Hougland v. Lomas & Nettleton Mortgage Co.*, 886 F.2d 1182, 1183 (9th Cir.1989); *In re Hart*, 923 F.2d 1410, 1413 (10th Cir.1991); Margaret Howard, *Stripping Down Liens: § 506(d) and the Theory of Bankruptcy*, 65 Am.Bankr.L.J. 373, 374 n. 2 (1991).

*Dewsnup*, the touchstone of these cross-motions for summary judgment, called into question the whole concept of voiding the unsecured portion of the lien. In *Dewsnup*, the debtor sought to invalidate a mortgage lien on her Utah farm. The farm had been deemed abandoned by the Chapter 7 trustee, so the estate no longer had any remaining interest in the property. The Supreme Court held:

[Section] 506(d) does not allow petitioner to "strip down" respondents' lien, because respondents' claim is secured by a lien and has been fully allowed pursuant to § 502. Were we writing on a clean slate, we might be inclined to agree with petitioner that the words "allowed secured claim" must take the same meaning in § 506(d) as in § 506(a). But, given the ambiguity in the text, we are not convinced that Congress intended to depart from the pre-Code rule that liens pass through bankruptcy unaffected.

*Dewsnup*, 502 U.S. at ——, 112 S.Ct. at 778.

This holding appears to have been driven by two factors: (1) as a voluntary lien, the bargained-for result under state law would have been that, if the debtor failed to repay the loan, the lender was entitled to foreclose; and (2) there was no benefit whatever realized for the estate or other creditors from this post-abandonment voiding of the lien. Under the circumstances, the Supreme Court considered unfair an outcome that appeared to place all the risk of a decline in property value on a mortgage lender, and none on the debtor, who would retain the upside potential if the property later appreciates in value. A "windfall," the Court called such a result. *Id.*

If an undersecured creditor forecloses, one of two things happens: either the creditor is paid in cash the fair market value of the property by a third party purchaser, which in theory should be the equivalent of the collateral value determined by the bankruptcy court; or the creditor buys the property itself by credit-bid if other bids at the sale are not sufficiently attractive to the creditor. The creditor thus has the choice of whether to forego the immediate cash in favor of betting on the property's future appreciation.

What disturbed the Court in *Dewsnup* was the debtor's attempt to create a third alternative in which the creditor neither received the cash value of the property nor the appreciation potential of ownership. The true effect of lien-stripping in Chapter 7 cases is to allow debtors to redeem their property at a discounted value by installment payments over a protracted period—without giving the creditor any choice whatsoever in the matter.

The issue, therefore, is *not* really how much of the claim is protected by the lien, but rather who has the right to ownership of the asset when it leaves bankruptcy. Under what conditions does the undersecured creditor have the right to bid for ownership of the property? Framed in this manner, the unfairness of Chapter 7 lien-stripping lies in its failure to require that the creditor receive the cash value of its collateral as the price for being deprived of its opportunity to credit-bid at a foreclosure sale. But this is not a Section 506 failing. Other provisions of the Code are responsible for providing the checks and balances on lien-stripping.

■ For consumer debts,[1] the constraints on the terms and conditions under which the debtor may keep collateral appear in Sections 521, 524 and 722, not in Section 506. Among the "Debtor's Duties" enumerated in section 521 is the requirement that debtors *must* file a statement of intention with respect to estate property that secures a consumer loan. In that statement of intention, the debtor must choose either to retain or surrender the property. If the choice is to keep the collateral, the debtor must also elect whether to redeem the property or reaffirm the debt. Within 45 days, the debtor is supposed to perform the stated intention.[2]

■ Reaffirmation of the debt requires compliance with the procedures of Section 524, which are designed to assure that debtors make well-informed, carefully considered decisions if they opt to waive the personal discharge in exchange for keeping consumer goods (including real property) under installment contracts. Alternatively, a debtor may redeem consumer collateral by "cashing out" the creditor for the fair market value of the collateral under Section 722. Redemption in installments, however, is not allowed. If the debtor wants to pay the creditor in installments, *generally reaffirmation of the full* amount of the obligation or conversion to Chapter 13 is required. *See, In re Bell,* 700 F.2d 1053, 1056 (6th Cir.1983).

Section 521(2) only applies to consumer debts. It does *not* impose any specific duties upon the debtor with respect to collateral for business debts. If the business is being reorganized, then retention of business collateral will be governed by the requirements for treatment of secured creditors set forth in each of the reorganization chapters, as discussed below. If the business is in liquidation under Chapter 7, however, neither Section 521(2) nor the reorganization provisions apply. There is a gap in the Code. Nothing in the legislative history suggests that Congress even considered the possibility that a debtor might try to keep business collateral where the business was being liquidated in a Chapter 7 case. Rather, the property of the estate was expected to be sold for cash or the equivalent and distributed to creditors.

This omission rests on the apparent assumption that liquidating debtors would not want to keep business collateral from a failed business. Under most circumstances, this assumption is probably valid. In a corporate or partnership Chapter 7 case, usually no debtor entity survives the bankruptcy to retain possession of any collateral. Sole proprietor Chapter 7 cases, of course, do involve natural-person debtors who conceivably might want to retain business collateral when they exit bankruptcy, but under what circumstances is this likely to occur? If these *debtors are continuing in business,* usually they will be reorganizing under Chapter 11, 12 or 13. Moreover, few debtors have a close personal attachment to business collateral— unless, of course, the property is a family farm, as in *Dewsnup,* or a family home which has been pledged as security for a business debt or has become subject to a tax lien related to business or investment activities, as here.

---

1. *"Consumer debts"* are defined as "debt incurred by an individual primarily for a personal, family or household purpose." 11 U.S.C. § 101(8). *See, e.g., In re Kelly,* 841 F.2d 908, 913 (9th Cir.1988) ("Debt incurred for business ventures or other profit-seeking activities is plainly not consumer debt for purposes of section 707(b).")

2. Section 521, however, does not specify what is supposed to happen if the debtor fails to complete the Section 521 form or fails to perform according to the stated intention. The issue has primarily been litigated where the debtor is not otherwise in default under the terms of the installment contract. As with so many issues of interpretation of the Bankruptcy Code, the courts disagree about the meaning of Section 521(2).

One line of cases holds that, if the debtor does not reaffirm or redeem the property, it must be surrendered to the secured creditor. *See, In re Taylor,* 3 F.3d 1512, 1516 (11th Cir.1993); *In re Edwards,* 901 F.2d 1383, 1387 (7th Cir.1990). The contrary authorities hold that a debtor who is not otherwise in default may keep collateral and *continue to perform under the installment* contract without reaffirming or redeeming. *See, In re Belanger,* 962 F.2d 345, 349 (4th Cir.1992); *Lowry Federal Credit Union v. West,* 882 F.2d 1543, 1546 (10th Cir.1989). A debtor in default at the time of bankruptcy, however, must choose and perform one of these two options, because otherwise the collateral will eventually be lost to the creditor pursuing its state court remedies.

But the *Dewsnup* debtors could not reorganize under Chapter 12 for the simple reason that relief under that chapter was not available when the case was filed in 1984. By the time the Supreme Court considered *Dewsnup,* other similarly situated debtors could achieve essentially the same results via Chapter 12, which was enacted in 1986 as part of the Bankruptcy Judges, United States Trustees, and Family Farmer Bankruptcy Act of 1986. Pub.L. No. 99–554, 100 Stat. 3124 (1986) (the "1986 Act"). In other words, the fact pattern in *Dewsnup* presented the Supreme Court with a problem that had already been effectively redressed by an intervening amendment to the Bankruptcy Code—indeed, an amendment that unequivocally permits lien-stripping, as discussed below.

**B.** *Lien–Stripping in Reorganization Cases*

■ *Dewsnup* did not purport to answer the question of avoidability of liens in reorganization cases. It expressly reserved the issue of whether its holding applies under other chapters or, indeed, to any other fact pattern besides the specific situation before it. The Supreme Court acknowledged its difficulty in anticipating the ramifications of its holding:

> [Section] 506 of the Bankruptcy Code and its relationship to other provisions of that Code do embrace some ambiguities. See 3 Collier on Bankruptcy, ch. 506 and, in particular, ¶ 506.07 (15th ed. 1990). Hypothetical applications that come to mind and those advanced at oral argument illustrate the difficulty of interpreting the statute in a single opinion that would apply to all possible fact situations. We therefore focus upon the case before us and allow other facts to await their legal resolution on another day.

*Dewsnup,* 502 U.S. at ——–——, 112 S.Ct. at 777–78.

Moreover, the *Dewsnup* opinion expressly excluded from its analysis of precedents any reorganization cases under equity receiverships or former Chapters X and XI. As the opinion notes,

> *Apart from reorganization proceedings,* see 11 U.S.C. §§ 616(1) and (10) (1976 ed.),

no provision of the pre-Code statute permitted involuntary reduction of the amount of a creditor's lien for any reason other than payment on the debt.

*Id.* 502 U.S. at ——, 112 S.Ct. at 779 (emphasis added). This almost off-handed rejection of the relevance of reorganization precedents is particularly troublesome in assessing *Dewsnup*'s implications for Chapter 11 cases. Coupled with its express denial of any intent to create a rule of universal application, *id.* 502 U.S. at ——–——, 112 S.Ct. at 777–778, the Supreme Court clearly signaled its reservation of the question of Section 506's meaning under other chapters of the Bankruptcy Code.

This caveat could be interpreted as an invitation to limit *Dewsnup* to its facts, that is, to Chapter 7 cases—and the majority of courts considering *Dewsnup* in the context of the reorganization chapters of the Code have generally done so. Several other cases involving issues under Chapters 12 or 13 have indicated in *dicta* that *Dewsnup* should not apply in any reorganization cases. For example, in *In re Jones,* 152 B.R. 155 (Bankr. E.D.Mich.1993), pre-*Nobelman,* the court allowed lien-stripping of mortgage liens in a Chapter 13 case, concluding that *Dewsnup*'s holding should not apply under any of the reorganization chapters. Referring to Chapter 11, the court stated:

> [E]ven a cursory review of the implications should *Dewsnup* be extended to chapter 11 vividly demonstrates why the Court was so circumspect [in suggesting its holding would not necessarily apply outside of chapter 7].
>
> As the Court itself implicitly acknowledged, categorically prohibiting lien stripping in chapter 11 would disrupt established pre-Code law. More to the point, such a result would be contrary to the intent of Congress when it enacted chapter 11 in 1978.

*Id.* at 173–74.

In cautioning against an overly broad interpretation of its holding in *Dewsnup,* however, the Supreme Court apparently failed to consider that Section 103(a) makes the provisions of Chapter 5 of the Code generally

applicable to all non-railroad cases under Chapters 7, 11, 12, and 13. In theory, Section 506 should apply uniformly across all of the substantive chapters, unless specifically limited by provisions designed for that chapter, as the Court acknowledged in *Nobelman v. American Savings Bank*, 503 U.S. ——, —— n. 3, 113 S.Ct. 2106, 2109 n. 3, 124 L.Ed.2d 228 (1993). A strict reading of Section 103(a) has led one bankruptcy court to hold that *Dewsnup* must be applied in Chapter 11, despite that court's well-reasoned conclusion that *Dewsnup* was wrongly decided as a result of erroneous analysis of Section 506's statutory language and legislative history. *In re Taffi*, 144 B.R. 105 (Bankr. C.D.Cal.1992), *rev'd on other grds.*, 1993 WL 558844 (C.D.Cal.1993); *accord In re Blue Pacific Car Wash*, 150 B.R. 434, 435 (W.D.Wis.1993) (applying *Taffi* holding in Chapter 11 case).

This Court agrees with *Taffi*'s conclusion that *Dewsnup*'s result is hard to reconcile with the overall structure and language of the Code using normal principles of statutory construction. The basic premises of the *Dewsnup* opinion are faulty. First, the weakness of *Dewsnup*'s analytic premise—that "allowed secured claim" means something different in paragraph (a) than in paragraph (d) of the same section of the Bankruptcy Code—has been thoroughly exposed by Justice Scalia's dissent. Second, the weakness of its historical premise—that consensual liens had always been allowed to ride through bankruptcy and remain enforceable—was analyzed by this Court in *In re A.V.B.I., Inc.*, 143 B.R. 738 (Bankr.C.D.Cal. 1992). *A.V.B.I.* concluded that the Supreme Court relied on precedents of questionable validity and ignored the express language of Section 506. *Id.* at 744–47.

*Dewsnup* nevertheless remains controlling precedent in Chapter 7 cases. The Supreme Court did not, however, intend its holding in that Chapter 7 case automatically to govern in reorganization cases, instead expressly reserving that issue. The followup question, as asked by *Taffi*, is whether mandating the same result in Chapter 11 cases was the *un* intended consequence of *Dewsnup* because of Section 103(a). This Court disagrees with

*Taffi* that an examination of that section is all that is required to determine the answer. *Taffi* did not consider either the implications of prohibiting lien-stripping in reorganizations under Chapter 11, or whether specific provisions of Chapter 11 might cut against the general applicability of Section 506. Contrary to the Supreme Court's assumption that any apparent availability of lien-stripping under Section 506(d) was an unintentional drafting error, examination of the reorganization chapters reveals that numerous provisions of the Code make sense only if Congress intended lien-stripping to be available in reorganization cases.

Conceptually, like state foreclosure laws, bankruptcy is a method (or more precisely a set of methods) for establishing the value of property at a particular point in time, determining who has the right to the proceeds of its sale, and transferring the ownership interest to a new entity, which may be the debtor, the creditor, or a third party. In Chapter 7 cases, the value and respective rights of the debtor and creditor are fixed as of petition date. Under the reorganization chapters, however, the critical point in time is the confirmation of the plan. The basic framework of those chapters contemplates the revesting of estate property in reorganized debtors "free and clear of all claims and interests of creditors, equity security holders, and of the general partners of the debtor," provided that the property was "dealt with by the plan." 11 U.S.C. § 1141(c); *see*, 11 U.S.C. § 1227(c); 11 U.S.C. § 1327(c). The term "interests" includes "liens," which are defined under the Code to mean "a charge against or *interest* in property to secure payment of a debt." 11 U.S.C. § 101(37) (emphasis added).

The revesting is, of course, subject to the terms of the plan itself. The requirements for confirmation of plans of reorganization define what methods may be used to modify or eliminate the claims and interests of creditors and others. Thus, the answer to whether lien-stripping is available in Chapter 11 lies in analysis of Section 1129, which sets the limits on what a plan may provide. Sections 1222 and 1322 define the comparable standards under Chapters 12 and 13. These

sections demonstrate that, in recognition of the potential for abuse and unfairness of letting reorganized debtors keep collateral without paying the full debt, Congress built into the reorganization chapters specific restrictions on terms and conditions under which that result can occur. *See, e.g., In re 680 Fifth Avenue Associates,* 156 B.R. 726, 731 n. 7 (Bankr.S.D.N.Y.1993) (Chapter 11 case); *In re Leverett,* 145 B.R. 709 (Bankr. W.D.Okla.1992) (Chapter 12 case); *In re Butler,* 139 B.R. 258, 59 (Bankr.E.D.Okla. 1992) (Chapter 13 case).

### 1. *Lien–Stripping in Chapter 12 Cases*

The problem for the family farmers in *Dewsnup* was that they filed their Chapter 7 case too early to be able to take advantage of the lien-stripping options created by the passage of Chapter 12 in 1986. *Dewsnup* was filed in 1984, after two unsuccessful tries at Chapter 11. As intervening events have demonstrated, Congress was not thinking at all about family farms when it wrote the Code in 1978: the Code proved totally incapable of dealing effectively (especially in the political and social senses) with the farming financial crisis that swept the Midwest in the early and mid–1980s. The immediate legislative response was the rapid adoption of Chapter 12 for the reorganization of family farms. In analyzing that statute, one court observed:

> The major objective of this chapter, enacted in 1986, was to "help[ ] family farmers to keep their farms" in the midst of "a nationwide farm crisis." 132 Cong.Rec. H9001 (daily ed. Oct. 2, 1986), *reprinted in* App. 4, *Collier on Bankruptcy* XXII–10. The ability of such farmers to strip down liens was apparently regarded as an important means of achieving that objective and, because §§ 1111(b)(2) and 1129(b)(2)(B)(ii) were viewed as almost insurmountable obstacles for a debtor wishing to effectuate a stripdown, Congress made the considered determination that there would be no such analogous provisions in chapter 12. *See* 132 Cong.Rec. S15084 (daily ed. Oct. 3, 1986), *reprinted in* App. 4, *Collier on Bankruptcy* XXII–38 to XXII–39.... Thus *Dewsnup,* if applied in chapter 12, would preclude debtors from

utilizing that chapter for a purpose which Congress endorsed.

*In re Jones,* 152 B.R. 155, 174–75 (Bankr. E.D.Mich.1993) (pre-*Nobelman,* holding that *Dewsnup* does not apply in Chapter 13).

■ Chapter 12 was specifically designed to facilitate the stripping down of liens on family farms with repayment of the reduced debt by installments under a plan of reorganization—in other words, exactly what the *Dewsnup* debtors were trying to do. Its principal purpose was to provide a mechanism for repayment of the reduced loan over time, because the farm debtors were obviously unable to redeem their farms for cash at a foreclosure sale. *See* 132 Cong.Rec. S15084 (daily ed. Oct. 3, 1986), *reprinted in* App. 4, *Collier on Bankruptcy* pp. XXII–16–17, XXII–43 (15th ed. 1993). In exchange, like Chapter 13, Chapter 12 requires debtors to commit all of debtor's "disposable income" toward payments under the plan. Section 1225(b)(1).

The 1986 Act, however, expressly prohibited conversion of pending cases to Chapter 12. Pub.L. No. 99–554 § 302(c), 100 Stat. 3119 § 302(c) (1986); *see* 5 *Collier on Bankruptcy* ¶ 1200.05, p. 1200–20 (15th Ed.1992). Thus, the *Dewsnup* debtors, who proved unable to complete a Chapter 11 plan under that chapter's more stringent requirements for treatment of secured creditors, were unable to convert their case from Chapter 7 to Chapter 12. Instead, undoubtedly inspired by the provisions of Chapter 12, the debtors tried to get the same type of relief in their Chapter 7 case by initiating an adversary proceeding in 1987 to avoid the undersecured portion of the lien.

### 2. *Lien–Stripping in Chapter 13 Cases*

Since *Dewsnup,* the lower courts have been attempting to decipher the meaning of that opinion both as a guide to proper statutory interpretation of the Bankruptcy Code, and as a holding with potentially broadreaching implications. Its most immediate impact was on the issue of mortgage lienstripping in Chapter 13 cases, a question left open in *Dewsnup.*

Pre–*Dewsnup,* three circuits had ruled that lien-stripping was permissible in Chap-

ter 13 plans. They allowed bifurcation of mortgage claims into their secured and unsecured portions, and modification of the unsecured portion as part of a Chapter 13 plan, following the lead of the Ninth Circuit in *Hougland v. Lomas & Nettleton Co.*, 886 F.2d 1182 (9th Cir.1989). In *Hougland*, the issue was the effect of the Section 1322(b)(2) prohibition of the modification of "the rights of holders of secured claims . . . secured only by a security interest" in the debtor's home. *Hougland* held that Section 1322 did not limit the debtor's ability under Section 506(a) and (d) to "strip down" liens to their collateral value on petition date. In other words, Section 1322(b) only protects the purchase money lender to the extent that it holds an "allowed secured claim" as defined in Section 506(a). As *Hougland* stated:

> [I]t is clear that section 506(a) applies to Chapter 13 proceedings. *See* § 103(a). There is, therefore, no reason to believe that the phrases "secured claim" and "unsecured claim" in section 1322(b)(2) have any meaning other than those given to them by section 506(a).

Congress quite plainly has provided for the separation of undersecured claims into two components—a secured component and an unsecured component. It has then provided for their treatment in Chapter 13 proceedings. The secured portion has special protection when residential lending is involved. The unsecured portion does not.

*Id.* at 1183, 1185; *accord: In re Hart*, 923 F.2d 1410, 1415 (10th Cir.1991); *Wilson v. Commonwealth Mortgage Corp.*, 895 F.2d 123, 127 (3d Cir.1990).

For the first year after *Dewsnup*, Chapter 13 cases mostly continued to follow *Hougland*, distinguishing or discounting the import of *Dewsnup*. The Second Circuit decided that *Hougland* was still good law, despite *Dewsnup*, increasing the number of circuits allowing bifurcation of home mortgages to a total of four. *In re Bellamy*, 962 F.2d 176, 180–81 (2d Cir.1992). The Ninth Circuit agreed. *Lomas Mortgage U.S.A. v. Wiese*, 980 F.2d 1279, 1282 (9th Cir.1992), *vacated and remanded*, 503 U.S. ——, 113 S.Ct. 2925, 124 L.Ed.2d 676 (1993) (remanded for recon-

sideration in light of *Nobelman* ). In *Wiese*, the undersecured mortgage lender appealed the order confirming the plan and asked the Court of Appeals to reconsider its prior ruling in *Hougland*, in light of *Dewsnup*. Rejecting the lender's arguments, the Ninth Circuit reaffirmed *Hougland*, holding that:

> (1) a Chapter 13 debtor could bifurcate a claim secured only by the debtor's principal residence into a secured and unsecured portion; and (2) the lender's rights on the unsecured claim could be modified.

980 F.2d at 1281.

The Ninth Circuit's analysis of Section 1322, however, was rejected by the Fifth Circuit in *In re Nobelman*, 968 F.2d 483 (5th Cir.1992), *aff'd*, 503 U.S. ——, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993). Granting certiorari to resolve the split in the circuits, the Supreme Court sided with the Fifth Circuit. *Nobelman v. American Savings Bank*, 503 U.S. ——, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993). *Nobelman* held that mortgage lien-stripping was specifically barred by Section 1322(b)(2), thereby overruling the *Hougland* line of cases.

Under the Supreme Court's analysis in *Nobelman*, proper interpretation of Section 1322(b)(2) turns upon what is meant by the phrase, "*the rights of holders* of . . . a claim secured only by a security interest" in the debtor's house, not upon the definition of "secured claim" under Section 506. Stripping down the secured portion of the lender's claim and permitting discharge of the unsecured portion materially affects the lender's contractual rights to payment under the note and deed of trust. For that reason, *Nobelman* held that Section 1322 bars lien stripping of this specifically protected category of secured obligation. *Id.* 503 U.S. at ——, 113 S.Ct. at 2111.

The resolution of the case at bar was delayed in part to await the resolution of *Nobelman*, in anticipation that the Supreme Court would provide further guidance on the scope of *Dewsnup*. But it turned out that *Nobelman* did not resolve the question of the analytic significance of *Dewsnup*, because it effectively ducked the Section 506(d) issue. Its only reference to *Dewsnup* was to empha-

size the importance of giving effect to state-law based rights, contractually bargained for by the mortgagor and the mortgagee. 503 U.S. at ——, 113 S.Ct. at 2110. Instead, like the Court's related decision in *Rake v. Wade,* 503 U.S. ——, 113 S.Ct. 2187,.124 L.Ed.2d 424 (1993), *Nobelman*'s analysis turns entirely upon close scrutiny of the statutory language of Section 1322 of the Code under the rules of strict construction elaborated in *United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989). Holding that proper interpretation of Section 506(b) depends upon the placement of a comma, *Ron Pair* is the "methodological antithesis" of *Dewsnup.* *Dewsnup,* 502 U.S. at ——, 112 S.Ct. at 787 (Scalia, J. dissenting).

The Fifth Circuit's *Nobelman* opinion had not attempted to address *Dewsnup* either. Instead, with remarkable prescience, it cited the case only for the proposition that a Supreme Court that refused to allow lien stripping in a Chapter 7 case was also likely to block bifurcation in a Chapter 13 case. 968 F.2d at 487.

Five circuit courts and the Supreme Court have now considered whether Section 1322(b)(2) provides special protections to residential lenders. None would have had to reach this question *but for* the underlying premise that, unless Section 1322 imposed some sort of bar, debtors would otherwise be permitted to strip down their house liens and discharge the unsecured deficiency. For example, the Tenth Circuit in *In re Hart* reasoned:

> The dispositive issue in this case is whether Eastland's undersecured loan may be bifurcated into two *claims* by applying the general principles of section 506(a) to the mortgage and then protecting only the secured claim by the provisions of section 1322(b)(2). We believe it can.

923 F.2d 1410, 1413 (10th Cir.1991).

If Section 506 does not permit debtors to bifurcate undersecured claims and strip down liens to their collateral value, then *all* secured creditors would be freed of any concern that debtors could reduce the amount of their liens while retaining the property. If Congress did not intend to allow lien strip-ping in general in Chapter 13 cases, then why would it bother to draft the exclusionary language of Section 1322? As Justice Stevens' concurring opinion in *Nobelman* emphasizes, the legislative history of Section 1322(b)(2) reflects Congressional desire to provide special protections to residential lenders. 503 U.S. at ——, 113 S.Ct. at 2112. The threat from which they are being protected must be lien-stripping, because no other threat is evident.

3. *Lien–Stripping in Chapter 11 Cases*

By citing *Dewsnup* on a collateral point while rejecting its analytic approach, *Nobelman* sends such conflicting signals that it offers little additional guidance on the question presented in the present case. Therefore, the focus returns to *Dewsnup* itself and the applicability of its holding to Chapter 11 cases.

This Court has been able to locate only three reported Chapter 11 cases that have expressly ruled whether *Dewsnup* bars lien stripping. The validity of *Dewsnup*'s analysis and holding was sharply questioned by the bankruptcy court in *In re Taffi,* 144 B.R. 105, 114 (Bankr.C.D.Cal.1992), *rev'd on other grounds,* 1993 WL 558844 (C.D.Cal.1993). But the court held that the *Dewsnup* holding must govern all bankruptcy cases under all chapters because Chapter 5's provisions apply across the board, no matter what the consequences might be. The opinion in *In re Blue Pacific Car Wash,* 150 B.R. 434, 435 (W.D.Wis.1992), followed *Taffi.*

*Taffi*'s axiomatic application of the *Dewsnup* holding was rejected in *In re 680 Fifth Avenue Associates,* 156 B.R. 726 (Bankr. S.D.N.Y.1993), which held by implication that lien stripping is permitted in Chapter 11 cases, because otherwise Section 1111(b) makes no sense. *Id.* at 731 n. 7. The issue in *Fifth Avenue* was whether an undersecured creditor that was not in privity with the debtor, could invoke Section 1111(b)'s option to be treated as fully secured under a plan of reorganization.

 Section 1111(b)(2) gives an undersecured, nonrecourse lender some ability to control its destiny in a Chapter 11 case because it allows the creditor to elect to be

treated as fully secured, "notwithstanding Section 506(a) of this title," thereby preventing a "cash out" under Section 1129. Ordinarily, a Chapter 11 plan can be confirmed over a dissenting secured creditor if the plan is "fair and equitable" with respect to that class. Section 1129(b)(1). For secured creditors, the plan must either (1) leave the lien in place and pay deferred cash payments equal to the "value of such holder's interest" in the collateral; or (2) provide the "indubitable equivalent of such claims."[3] The plan can also provide for the sale of the collateral, but the secured creditor's treatment must satisfy one of the two foregoing standards.[4] Section 1129(b)(2)(A). In other words, the secured portion of an undersecured creditor's claim is only equal to the value of its collateral, and the creditor can be "cashed out" for the value of the collateral, instead of being paid the full amount of its claim. *See, e.g.,* Kenneth N. Klee, *All You Ever Wanted to Know About Cram Down Under the New Bankruptcy Code,* 53 Am.Bankr.L.J. 133, 154 (1979).

In *Fifth Avenue,* the debtor sought a ruling that the creditors' allowable secured claim was limited to the value of the real property that constituted the single asset of the estate, and that Section 1111(b)'s election is unavailable to parties not in privity with the debtor. The creditor argued that its Section 1111(b)(2) election prevented the "strip down" of its lien. In holding that the creditor was entitled to invoke Section 1111(b) despite the lack of privity, the court reasoned:

> Although its origins are somewhat obscure, commentators have generally agreed that Congress enacted § 1111(b) to correct perceived abuses occurring under Chapter

XII of the Bankruptcy Act of 1898 ("the Act"). The Act provided certain debtors with a cramdown power that reduced undersecured claims to the value of the collateral.

The Act's cramdown provision was particularly frustrating for nonrecourse lenders. One case, *In re Pine Gate Associates, Ltd.,* 2 Bankr.Ct.Dec. 1478 (Bankr.N.D.Ga. 1976), is widely believed to have been the catalyst that prompted Congress to improve the position of nonrecourse lenders under Chapter 11 in comparison with their treatment under the Act. In *Pine Gate,* the court confirmed a plan that permitted the debtor to retain ownership of the property by paying the appraised value of the collateral to the undersecured, nonrecourse creditor. Lenders reacted negatively to the *Pine Gate* decision because the absence of a public sale prevented the mortgagee from bidding in its liens, and the nonrecourse nature of the loan barred the lender from asserting an unsecured deficiency claim.

In response to *Pine Gate,* Congress created § 1111(b) to address the concerns of the lending community. Section 1111(b) changes pre-Code law in three key ways. First, § 1111(b) states that all liens encumbering property of the debtor are treated as recourse, regardless of whether the creditor's lien was recourse or nonrecourse under nonbankruptcy law. Second, regardless of the terms of the loan and applicable nonbankruptcy law, § 1111(b) allows an undersecured nonrecourse creditor to split its claim into a secured claim equal to the value of the collateral and an unsecured claim for the deficiency. Third, § 1111(b)(2) permits an undersecured

---

**3.** Section 1129(b)(2)(A) requires, as a condition to confirmation of a plan, that:

With respect to a class of secured claims, the plan provides—

(i)(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount

of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property; ....

**4.** The right to credit bid, as set forth in Section 363(k), is another example of the kind of protections that the Code affords to the undersecured creditor. That protection is available whether the property is being sold during the case, or under a plan of reorganization. *In re California Hancock, Inc.,* 88 B.R. 226, 230–31 (9th Cir. BAP 1988).

creditor to elect to have its claim treated as fully secured in a plan that provides for the debtor's retention of the collateral.

156 B.R. at 730–31. Given this significant and novel protection for undersecured creditors that is built into Chapter 11, the court concluded that *Dewsnup* could not apply in Chapter 11 cases:

> [T]he fact that the § 1111(b) election exists at all presumes that debtors possess the authority under the Code to limit secured claims to the value of the collateral. The election allows an undersecured creditor to opt out of the lien-stripping found in § 1129 in exchange for relinquishing its deficiency claim, retaining its lien for the full/amount of its claim, and receiving payments totalling the entire allowed claim and having a present value equal to the secured amount.

*Id.* at 732 n. 7. *See,* Lee R. Bogdanoff, *The Purchase and Sale of Assets in Reorganization Cases—Of Interest and Principal, of Principles and Interests,* 47 Bus.Law 1367, 1455–58 (1992). Section 1129(a)(7)(B) [5], however, only guarantees that the present value of the payments to a secured creditor electing Section 1111(b) treatment must equal the value of that creditor's interest in the collateral, *i.e.,* the amount that the creditor would theoretically receive in a foreclosure sale. *See, Dewsnup,* 502 U.S. at ——, 112 S.Ct. at 785 (Scalia, J., dissenting).

Modifying the rights and interests of secured creditors is at the heart of most reorganizations. Many Chapter 11 cases would be pointless and unreorganizable, if debtors could not reduce secured debt on property that had declined in value. This would particularly apply to single asset real estate cases, where the sole purpose of the case is usually to relieve the burden of a secured debt load that the property can no longer support.[6] At least under current business conditions, very few Chapter 11 plans seek merely to stretch out or reduce payments to unsecured creditors. Most debtors are currently entering Chapter 11 with their assets fully encumbered, which means that their plans must restructure the secured debt in order to make a meaningful difference in their financial well-being.

To hold that debtors remain burdened by exactly the same liens after confirmation as before, would radically change life as we know it in Chapter 11 cases. As one bankruptcy court expressed it, to bar lien-stripping in reorganization cases under Chapters 11, 12 or 13,

> would, in essence, gut the sum and substance of the reorganization and rehabilitation of debt concept under the Bankruptcy Code. In such cases, the Debtor would propose a plan for repayment of creditors to the extent of the value of the property securing the creditor's claim, but would still owe the unsecured portion of the claim, post-confirmation, in order to obtain a release of the lien on said property. This would require all plans filed under Chapters 11, 12 and 13 to pay all creditors one hundred percent of their claims in order for the debtor to emerge from bankruptcy with a "fresh start." Clearly, this has never been the purpose contemplated for § 506(d).

*In re Butler, supra,* 139 B.R. at 259 (allowing bifurcation and avoidance of an IRS lien in a Chapter 13 case). *See, In re Leverett, supra,*

---

5. Section 1129(a)(7) conditions confirmation of a plan on either the acceptance by creditors; or their receipt of property worth as much as they would receive in a Chapter 7 liquidation; or:

> (B) if section 1111(b)(2) of this title applies to the claims of such class, each holder of a claims of such class will receive or retain under the plan on account of such claim property of a value, as of the effective date of the plan, that is not less than the value of such holder's interest in the estate's interest in the property that secures such claims.

6. Whether single asset real estate cases should be discouraged or entirely prohibited has been the subject of much debate and proposals for legislative reform. Whatever the answer to that policy question, the legislative history indicates that Congress contemplated that such cases would and could be filed under Chapter 11. For a discussion of the legislative history, *see In re Fields,* 127 B.R. 150, 153 (Bankr.W.D.Tex.1991); *In re Greystone III Joint Venture,* 102 B.R. 560, 564–66 (Bankr.W.D.Tex.1989), *aff'd,* 127 B.R. 138 (W.D.Tex.1990), *rev'd on other grounds,* 948 F.2d 134 (5th Cir.1991), *modified on other grounds,* 995 F.2d 1274 (5th Cir.1992), *cert. denied,* 503 U.S. ——, 113 S.Ct. 72, 121 L.Ed.2d 37 (1992).

145 B.R. at 713 ("The survival of all liens would preclude the finality necessary to the success of such rehabilitative efforts, and would render § 506(a) virtually meaningless in [chapter 12 and 13] cases.")

As one commentator observed,

a broad reading of *Dewsnup* and application of its result to chapter 11 reorganizations would dramatically affect the way reorganization plans may treat undersecured creditors.... [T]he plan provisions of the Code protect undersecured creditors against efforts to abscond with post-confirmation appreciation in collateral for the benefit of equity holders and perhaps other junior interests. There is no sound reason to transport the tortured statutory construction adopted by the Court in *Dewsnup* in chapter 7 contexts to chapter 11 plans.

Lee R. Bogdanoff, *The Purchase and Sale of Assets in Reorganization Cases—Of Interest and Principal, of Principles and Interest*, 47 Business Lawyer 1367, 1456 (1992) (footnotes omitted).

In short, liens are affected in Chapter 11 cases in many ways; they do not simply ride through, as the Supreme Court assumed in *Dewsnup*. Secured creditors are often unhappy about what can happen to their secured lien under a plan. For example, the Seventh Circuit recently affirmed an order confirming a plan over the objection of a fully secured creditor who had demanded payment of its assigned rents in addition to repayment of principal and interest, stating:

It does make rather a mockery of the principle that liens pass through bankruptcy unaffected to force Metropolitan to extend its loan for seven years at an interest rate fixed by a court, when, the loan having been defaulted on, the unpaid balance became immediately due and owing. It is two years since Metropolitan sued to foreclose, and obtained a receivership; it will be seven years, at best, before the loan is repaid; it could well be longer because the plan of reorganization gives JWA two years after the loan comes due to find the money to make the balloon payment.

But the principle that liens pass through bankruptcy unaffected cannot be taken literally, as we have seen; and it is the law that, provided the plan of reorganization gives the secured creditor the "indubitable equivalent" of his secured interest, the bankruptcy judge can force the creditor to accept the exchange. 11 U.S.C. § 1129(b)(2)(A)(iii); *In re Murel Holding Corp.*, 75 F.2d 941, 942 (2d Cir.1935) (L. Hand, J.); *In re Sandy Ridge Development Corp.*, 881 F.2d 1346, 1349–50 (5th Cir.1989).

*In re Wilson*, 965 F.2d 160, 172 (7th Cir. 1992) (Posner, J.); *see also* Kenneth N. Klee, *Cram Down II*, 64 Am.Bankr.L.J. 229, 235 (1990) ("[M]any rights in a creditor's bundle [of rights] are altered or destroyed in applying the fair and equitable rule.")

Chapter 11 limits the nature and extent of such modifications to the interests of secured creditors, most notably in Sections 1129 and 1111. If the *Dewsnup* premise is correct—that Congress intended that liens continue to attach in full to the property in question, regardless of its value, until paid—then what is the meaning of the "free and clear of claims and interests" language of Section 1141? Or the purpose of Sections 1111(b), and 1129(b)(2)(A)? All of these sections deal with ways to treat secured claims and liens other than leaving the lien intact until full payment.

### C. Lien-stripping and the IRS

█ The lien in the case at bar is *not* a voluntary lien resulting from a contractual bargain. Rather, it is an *in*voluntary tax lien. The final remaining question before this Court, therefore, is whether the fact that this lien is held by the Internal Revenue Service immunizes it from avoidance under Section 506(d) or under a plan. Section 506(d) does not distinguish between involuntary and voluntary liens, which would lead to the conclusion.that if voluntary liens can be stripped down in Chapter 11, then so can IRS liens.[7] The IRS contends that its liens are specially protected by 26 U.S.C.

---

7. The converse would also follow: if this case were still in Chapter 7, the *Dewsnup* holding would preclude avoidance. *See In re Rombach*, 159 B.R. 311, 313–14 (Bankr.C.D.Cal.1993).

§ 6325(a)(1), relying on *In re Isom*, 901 F.2d 744 (9th Cir.1990).

*Isom* addressed the issue of whether a tax lien survived bankruptcy in the face of a general Chapter 7 discharge. It did not, however, consider whether the tax lien could be avoided under Section 506. Rather, the analysis focused on Section 6325(a)(1) of the Internal Revenue Code which provides that a tax lien shall be released when "the liability for the amount assessed ... has been fully satisfied or has become legally unenforceable." The Ninth Circuit held that a general discharge in Chapter 7 does not have the effect of rendering tax liability legally unenforceable. In reaching that conclusion, the court noted that Section 522(c)(2) protects tax liens from avoidance based on the exempt nature of the property in question, notwithstanding the fact that any personal liability was included in debtor's general discharge. *Id.* at 746. Debtors in the case at bar concede that their tax liens cannot be avoided simply because the property would otherwise be exempt. Indeed, their plan proposes to turn over to the IRS all exempt property other than their home.

Nothing in Sections 506 or 1129 suggests that IRS liens or claims are totally immune from avoidance or modification. Under the Bankruptcy Code, the IRS is the beneficiary of several specific provisions that reflect Congressional desire to protect the federal fisc. For example, Congress required that all tax obligations must be paid under a Chapter 11 plan within six years of assessment date. Section 1129(a)(9)(C). Certain tax obligations are entitled to priority under Section 507(a)(7). Section 523(a)(1) makes some tax debts nondischargeable. Although none of the obligations here are alleged to be nondischargeable, most debtors facing IRS liens would not be able to walk out of bankruptcy court in complete defiance of their tax obligations. The granting of IRS priorities and the nondischargeable nature of many such obligations are strong evidence that Congress provided an alternative method of realizing on such claims. Reading an IRS exception into Section 506 to prevent avoidance of the liens here is unnecessary and inappropriate.

## IV. CONCLUSION

As set forth above, Chapter 11 expressly contemplates the stripping down of liens to the value of the collateral at the effective date of the plan pursuant to Section 1129, unless the secured creditor invokes its right to make an election under Section 1111(b). To read the *Dewsnup* prohibition on lien-stripping into Chapter 11 would render these sections meaningless, violating the rule against interpreting statutes so as to render portions superfluous.[8] Therefore, this Court holds that lien-stripping under Section 506(d) is available in Chapter 11.

In this case, the IRS did not exercise its right to make an election under Section 1111(b). Therefore, the debtors have the right under Section 506 and Section 1129 to limit the IRS's secured claim to the fair market value of its interest in the collateral under the terms of their plan. Section 506(d) permits avoidance of the unsecured portion of the lien, leaving the IRS with an allowed unsecured claim for the deficiency.

This Court's conclusion that the *Dewsnup* rule is unworkable in Chapter 11 strongly suggests that the Supreme Court should reconsider its decision. According to Section 103, Section 506, like all provisions of Chapter 5 of the Bankruptcy Code, should apply uniformly under all substantive chapters. It is anomalous, to say the least, to allow a debtor to achieve opposite results merely by the tactic of converting a case from Chapter 7 to Chapter 11 and doing a liquidating plan. But it is even harder to envision a Chapter 11 without lien-stripping powers. Giving effect to the unique provisions of Chapter 11—specifically Sections 1111(b) and 1129—means that Section 506 must be construed to permit bifurcation of undersecured claims

---

8. *See Rake v. Wade*, 503 U.S. ——, ——, 113 S.Ct. 2187, 2192, 124 L.Ed.2d 424 (1993) (avoiding construction of Bankruptcy Code Section 1322(b)(5) that would suspend or supersede Section 506(b); *Louisiana Pub. Serv. Comm'n v. Federal Communications Comm'n*, 476 U.S. 355, 370, 106 S.Ct. 1890, 1899, 90 L.Ed.2d 369 (1986) (following "familiar rule of construction that ... provisions of a statute should be read so as not to create a conflict"); *see also* 2A *Sutherland Stat. Const.* § 46.05, at p. 103–04 (5th ed. 1992).

into their secured and unsecured components, and avoidance of the lien to the extent that it exceeds the value of the collateral.

This opinion shall constitute findings of fact and conclusions of law. A separate judgment order shall be entered forthwith.